My next case is number 241114 Sauer West LLC versus United States. Okay, Mr. Ripley. Good morning. May it please the court. We're here today because a simple question was erroneously made complex. Causation in rails-to-trails cases was always a simple matter, and it's only been since Kaplan clarified the causation standard that it's become complex. But as Kaplan went out of its way to say, the court's clarification took nothing away from the simplicity of the analysis. As rails-to-trails cases since Kaplan, and especially Memer and Hardy, have enunciated, causation is established based on the railroad's verified intent to abandon, absent extraordinary circumstances or clear mistake. Kaplan's aftermath spread widely throughout the CFC, but in every case since this one, except this one, and the exception that proves the rule in Hardy, causation has been established with 2022's Blevins as the most comprehensive example. Mr. Ripley, let me ask you, you challenge the, you say the Court of Federal Claims erred in considering these five factors that are from Kaplan, right? And you say it erred in its application because you say it should have come out differently as to how they weighed, correct? That's correct. Then you say that also the court erred in then turning to what it describes as these other considerations, and they're all listed, and I think it's page 24 to 25 of the joint appendix. Now why was, do you say it was error for the court to look at those considerations? Because it does seem, if you look at Coquillon, and specifically pages 1372 and 1373, that it's contemplated that a court should look at these factors. In that case, the court said the government didn't come forward with these factors, but there's clearly the suggestion that it can come forward. So why are you saying it was wrong for the Court of Federal Claims to look at these additional consideration factors? It wasn't wrong to look at them, because as you noted, Kaplan mentioned those, and the CFC in the decision since have done the same thing. And member in that appeal too did the same thing. The error was the robustness of the analysis, where going back to the simplicity of these cases, the whole history of this going back a couple decades now, looking too far into it gets closer to, in fact, the CFC called it a multi-factor analysis at one point during his analysis. Where if you're looking at all these details, that complicates the issue unnecessarily and brought us to this result. Your main point is that Kaplan was wrongly decided. We should ask to have the in-bank court overrule it. But you're also making an argument that I think Judge Stahl was asking about, which is whether under Kaplan here the case came out right. So yes, our primary position is that this case should be reviewed on bonk to firmly establish that causation is established. Notice of exemptions, the verified statement of intent, and need to, that should be the end of it. Setting that aside for purposes of this case in this argument, causation is clearly established under prong two, if you look at the facts of this case. And primarily looking at the notice of exemption, that verified statement to the STV that this line is no longer being used for freight services, we intend to abandon it. The railroad in this case actually went way above and beyond in that verified statement. If you compare it with other notices of exemptions in other cases, the railroad here said we haven't used it for 20 years, where the only requirement is you say two years as a railroad. That perfectly comports with the line as we see here, where even the CFC agreed that this was abandoned under state law three decades prior to the need to's issuance. So it's not that looking at the factors necessarily was wrong inherently. It was that the weighing of them and going above and beyond those factors too into this discontinuance standard, that was the error, where the weight should have been put on the railroad's own verified statements as an affirmative intent to abandon, which establishes the presumption that plaintiffs did that here upon issuance of the need to. And then to the extent... The government's position is that an application to abandon or an exemption request, it just starts the ball rolling. That in one sense, yes, it's officially formally an application to abandon. But at the same time, a host of different options can result from that application. You can perhaps begin now negotiating with a local town for a possible interim trail use and rail banking, or you can get financial assistance for the rail line, or you can choose not to abandon at all, or you can maybe hand over the easement to some other railroad company. And so that's why a deeper inquiry needs to take place. Is that an incorrect understanding of how the process works? No, that's not incorrect. It's just important to note. Then we go on to all the indicia under the pretty unique facts here that seem to militate against a view of abandonment. There was various maintenance work done. There was this railroad company does seem to be looking for other options, shopping around for other possibilities. And then there's this other issue that I'm interested in you talking about, which is the National Historic Preservation Act, and how at the time of the need to, this rail line was under some historical preservation review process that was lengthier than the actual need to period. And so regardless of whether the need to had issued the summer of 2008, it seems like there's no way that this railroad company could have in fact consummated abandonment during this second half of 2008. Is there something wrong with that understanding of the facts? So I'll hit the individual facts here first. As far as the maintenance and sporadic railcar storage, which existed as of the need to date, that is also true in many of these cases. In Blevins particularly, there was railcar storage. Going all the way back to Preso II, there was some railcar storage. The STV itself has said multiple times that railcar storage alone is not enough to keep it within federal jurisdiction. The railroad's verified statements at the time of the need to also said we intend to abandon this. It's not fit for freight service. There are no potential shippers that we see. Railcar storage was ongoing at that time. One of the issues here seems to be whether railcar storage is railroad use or whether you actually have to operate trains over the line, right? And yeah, I would say that's in this case. If you look at the history of these cases, it's clearly not enough to... Storage is not railroad use? Yes, that's right. And if you look back at the history of these cases, that's true. That's been present in many cases, and that's not satisfied railroad purposes. So going back to the facts here, unless you have a follow-up. Well, on the historic preservation thing, it seems to me historic preservation didn't require that you operate the line, only that you leave the tracks where they were, right? It's essentially a hold while the shippo at SHPO... No, but a hold on what? A hold on ripping up the tracks or a hold on stopping railroad operations? Ripping up the tracks. And to be more specific, precluding any consummation of abandonment as well. Is that right? That's true. However, I'll note that in Blevins, this was addressed. Judge Holt, in a previous opinion at HIPLE, also addressed this very robustly. Judge Tapp and Lowry also addressed this issue. All of them found this not to be an issue as vis-a-vis causation in these cases. It's a completely separate process. I don't understand how historic preservation prevents abandonment. You can abandon the line without ripping up the tracks, right? Yes, that's my understanding. It's essentially a hold. I guess the entire point is it's a completely separate process from... It is, but to formally consummate abandonment under this Transportation Act scheme, I think you're precluded from being able to do that formal abandonment final step if the rail line is under this National Preservation Historical Review thing. Is that right? I think you've said yes twice, and so that's what I'm trying to get to the bottom of. Yes, so playing back into the hold, these are separate processes. That may be true where certain conditions are placed upon it if things are found that warrant historic preservation. That does not mean the whole line is maintained. Use of the line, so vis-a-vis the landowners in this example, if they got their... You can abandon the line without ripping up the tracks, right? And being in compliance with the historic preservation condition. Can you repeat the first part? You can abandon the line without ripping up the tracks if the historic preservation requirement says you have to keep the tracks the way they were, right? That's right. What do you mean by you can abandon, though? That's really the question. Abandon as abandoned is understood under Colorado state law, or abandon as it's understood under the Transportation Act of 1920, where you have to actually consummate abandonment in order to formally abandon the easement, right? So this is where the separate tracks come into play. Is abandonment both state and federal or completely separate from impositions of condition on the national historic preservation? I understand, but now I've heard you say two opposite answers to what my question was on this, and now I'm really lost at what your position actually is. I'm sorry. I guess to clarify, you can consummate abandonment. I guess I misspoke there when I first responded to your question. I believe that's what we're talking about. You can consummate abandonment as under the regime put in place by, I don't know, all these federal statutes during the historical review process that the rail line's been put under by, I don't know, by the government through the NHPA. I don't want to step too far there as far as can it be consummated while the review is ongoing. I don't know if that's particularly the case, but it can be consummated. That was my question all along. During that historical review process, you certainly can't touch and rip up the track, but can you, in fact, consummate abandonment? You can. The thing about this process... During the historical review process. It depends on where the SHPO is in that process. And usually they review this very quickly where they will identify either there are things we need to look into or there are not fairly quickly in this process. This is really confusing. This is sort of a bit of a sideshow, but I don't understand how the historic preservation process prevents you from abandoning the line. The historic preservation process only requires that you keep the track the way it was. And I think in some of these rails-to-trails situations, the track does stay the way it is, but the line is nonetheless abandoned for railroad use, right? That's correct. That's correct. I'm sorry, did you have any other questions on this? Are you still confused? Yes, I am confused, but let's just keep going. We're running out of time. So here I understand that the railroad negotiated with the city of Des Moines, right? And they wanted money in order to allow the thing to be converted to a trail, correct? It's the city of Johnstown, but yes, that's correct. Okay, and does that happen frequently in these rails-to-trails cases that the railroad is asking for money to abandon the line? Yes, especially in smaller railroad situations, but if you look at Memmer, for example, that's also evidence of intent to abandon in these cases because that would invoke the Trails Act and cause the permanent take. But the easement, the right-of-way for rail use hasn't actually been abandoned when you go, when you convert it to an interim trail use, right? Because it's interim trail use and rail banking. Am I understanding the regime correctly? That's correct, and that's exactly why there's a taking. Otherwise, there would be a taking if this rail line ever gets converted into an interim trail use. That I understand, but if it does, it won't be an abandonment of the rail line easement. The state law of rail easement. Yes, that's correct, and that's why there's a taking. It prevents that from happening upon the need-to's issuance. And whether that's temporary or permanent, that's a durational question based on the facts of the case, which here established that it was a temporary taking based on the railroad's verified intent, the decades-long non-use of context at the time that intent was stated. Your taking is a temporary taking? That's correct. For the, whatever, the 180-day period of the need-to? That's correct. Well, your position is we have to just focus on the railroad's intent at the time of the need-to. Is that correct? That's correct. But the cases, and I'm thinking Kellan Nemmer, look at more than just that instant of the need-to. They look at things that happened before and afterward, correct? Yes, that's correct. So what is it? Are we looking at intent at the time of the need-to, but intent as informed by what we know happened before and afterwards? That's correct. Based on Kaplan, that's what you should do. The problem here at the CFC is that went way too far. And I think that's in contrast... I'm sorry, you said what? The court went where? The court went too far with that analysis. Too far where? In terms of time or what? I guess after. I guess, for example, we have here six years after the need-to in 2014. The railroad says there is industry developing, so we're going to put this back into service, notwithstanding that... You're talking now about all the items and events that are listed at the appendix 24 and 25, right? Yes, that's correct. But up until 2014, all statements from the railroad, which were all, again, verified, stated before the STB, were either, we're abandoning this, or other options which are public use and rail banking. So all the way up from the need-to's issuance through 2014, there was no indication whatsoever, especially in the context of the three decades prior of complete non-use, that the railroad did not intend, as of the need-to's issuance, that it was intending to abandon at that time. Okay, we'll give you a couple of minutes for rebuttal. Thank you. Mr. Herman. Good morning, Your Honors. May it please the Court, Brian Herman for the United States. Causation is a basic premise that applies equally in Trails Act cases as in any other taking, and the United States caused no taking here. The undisputed facts allow no reasonable inference that, absent this need-to, the railroad would have abandoned during the 180-day period. But before turning to those facts, I did want to start by talking about the National Historic Preservation Act, because of the questions earlier. Some of the confusion may come from the fact that plaintiffs chose not to reply on this issue. The first and only mention in the reply brief of the United States argument on the National Historic Preservation Act is in footnote 35 on page 21, and it merely tells this Court to see a different CFC decision. Okay, but the Historic Preservation Act doesn't prevent a railroad from abandoning the line. It just says you have to keep the tracks the way they were, right? Respectfully, Your Honor, that's incorrect, and Judge Chen... Okay, but why is that incorrect? This is Appendix 948. This is the National Historic Preservation Order, and it says that the railroad, quote, shall not file its consummation notice or initiate any salvage activities related to abandonment, including removal of tracks and ties, until the Section 106 process has been completed and the Board has removed this condition. The notice of consummation is the federal law requirement to abandon. The line is not out of the Court's jurisdiction, and no state law can operate until the notice of consummation is filed, and the Board's historic use order prohibits the filing of any notice of consummation. So as a matter of law, this railroad could not have abandoned from before the NITU issued until well after it expired. But as a practical matter, I guess I'm picking up on what Judge Dyke was saying earlier. As a practical matter, if the railroad's not doing anything and the tracks are just sitting there, in a sense, it has abandoned it, hasn't it? No, Your Honor, certainly not under federal law. Non-use is not enough to abandon under federal law, nor is inaction. And I think this actually goes a little bit to Your Honor's question about intent as well. If a railroad comes along and files an exemption petition and says, we do intend to abandon at a specific date, the Board issues abandonment authority, and the railroad does nothing, that abandonment authority will expire, and the railroad will not have abandoned. But I'm thinking that as a practical matter, even though statutory or regulatory requirements have been met, if a railroad is just sitting there, a rail line is just sitting there, the railroad's not doing anything, the average layperson would say it's abandoned. I realize it means something different in the statutory sense that we're involved in here, but isn't a railroad abandoned if all you have are the tracks, but nothing's going on over the tracks? I don't think either the state law or federal law supports that, but more importantly in this case, those aren't our facts. Okay, but you can abandon and keep the tracks the way they are, right? You could abandon under federal law while leaving the tracks in place, that's true. But here, this railroad couldn't abandon as a matter of federal law, and an important point is that, to your reference to a layperson, laypersons wouldn't believe this rail line was abandoned in that respect because it was used. There's been some looser reference to what use existed before the exemption petition. The language of the exemption petition is about local or overhead traffic, which is specific types of railroad use. Local traffic is freight train usage on the segment of the line at issue, going to a destination on that line. Overhead traffic is using the line to get to places from on either end. That was not occurring here, but railroad uses were occurring. This railroad was storing cars, marshalling cars, and earning money from the use of the trains. Its tracks were in place. It was maintaining it enough, certainly, to engage in railroad car storage. Okay, but this seems to be a difference between you and Mr. Ripley as to whether car storage constitutes railroad operations or not, right? What authority do we have that tells us what the answer is to that? Well, I can answer your question in two parts, Your Honor. First, to the authority, actually, Purceau itself answers that question. In Purceau, the court noted that the uses of the line had stopped in 1970, but that the railroad had not abandoned until 1975 when it pulled up the tracks. But more importantly than that- That's not addressing car storage as being railroad operations. The opinion continues, and I apologize for not giving that fuller answer, Your Honor. The opinion notes that from 1970 to 1975, the railroad was using the line for car storage, and it wasn't until that stopped with pulling up the tracks in 1975 that the court found the railroad had abandoned. But more importantly here, the court doesn't need to decide as a matter of law whether rail car storage is railroad purposes because the tackling question is whether this railroad would have abandoned during the NITU period, absent the NITU. And so the fact that it was using the line for storage and earning revenue shows that it would not have abandoned this line absent the NITU. And that's particularly the case with some of the additional facts, including during the NITU. In October of that year, 2008, this railroad replaced 700 spikes, ties, and switches. That's while the NITU was in place. If the railroad is spending money on switches, ties, and spikes while the NITU is in place, it's not going to abandon absent the NITU. Switches, ties, and spikes are not necessary for rail banking. Mr. Chairman, let me ask you in response to what position I understand Mr. Ripley takes is that you judge the railroad's intent at the time of the NITU. Is that correct? We disagree with that, Your Honor. What do you say? The test is, as Kaplan and Memer explained, is whether the railroad would have abandoned during the period of the NITU if the Surface Transportation Board had not issued it. Intent is a factor to consider, but it's not the test. Okay. The other question I have, and this maybe is just totally irrelevant to anything. Clearly, the landowners here had the burden of establishing the causation factor, correct? Yes, Your Honor. Then we have the language in Coquillon, and I'm maybe mispronouncing the name of it, where the court talks about the government came forward with no evidence to support its case. You know what I'm talking about?  Now, is that suggesting that there are shifting burdens of proof here of some kind? I'm just trying to sort that out a little bit You have the overarching requirement of causation burden being on the appellants, but yet there's that language that I just noted that suggests at some point the government has to, if it wants to prevail, come forward with something. What are we talking about here in causation and burden of proof or burden of coming forward? Am I clear in my question? Yes, Your Honor. I understand it, and I agree. There is an initial causation burden on the plaintiffs. The best way to consider that in light of what the court did in Coquillon is that the plaintiffs there came forward with evidence, and the United States was- On the five factors, basically. Yes, including that the railroad there, for instance, was authorized to remove track, unlike here, and pulled up the track, unlike here, and then, in fact, did abandon. So those factors were the evidence that the plaintiffs had come forward, and as I read the court's decision there, the United States came forward with nothing else, and so that evidence supported plaintiffs meeting their burden that the railroad would have abandoned during the MeToo period. And a particularly important fact in that regard is that in Kaplan, the railroad abandoned within three months of the MeToo's expiration, and if it had moved that quickly without a MeToo, it certainly would have abandoned within the six-month window of the MeToo in that case. Here, we have a starkly different situation. The railroad regained authority to consummate abandonment in March of 2009. It then had six years of unfettered abandonment authority, completely within its discretion, and chose never to abandon. In fact, within two months... But in answer to my question, though, what I... I understand you're reciting the facts of this case, but in answer to my question, if you have a situation where a railroad... I'm sorry, where landowners come in and they demonstrate the five factors from Kaplan that we've been talking about, or that you were referencing, what happens then? The government can just sit there and say, you haven't met your five factors, or if the five factors maybe are met, it then has to... It has a burden of coming in, right, with evidence? That's what I'm trying to understand, what exactly that discussion at 1372 to 1373 of Kaplan is sort of telling us. What do you say that discussion is telling us? I think the discussion is saying that similar to what the CFC did here, the court should engage in a holistic assessment of all the evidence to answer the question. I'm hesitant to speak too much to those factors as anything definitive, because the court never said those are the factors. It never said that they're exhaustive. In any case, there could be different factors, and so I think the best approach is looking at all of the evidence, what would the railroad have done? And those five factors are the only evidence that the plaintiffs had come forward with. And you'd say looking at all the evidence was the burden met? Correct. You're saying that this little discussion that we have at those pages of Coquillon is just a discussion specific to the particular circumstances of that case in terms of the way it had gone down in terms of the evidence? Yes, Your Honor. And I suppose this is... This is setting forth a rule. Correct. Correct. Well, the rule in Kaplan is what would the railroad have done absent the need to, would it have abandoned during the need to period? And so looking at all of the evidence to answer that question is the test. And I briefly just wanted to come back to that particular fact about the timing. Because here, the railroad regained its authority to abandon in March of 2009, and within two months, so by May of 2009, it filed a request to extend the time to abandon, saying it was seeking alternatives. So we don't have to worry about how far down is some of this evidence. It was spending money during the need to period. It was repairing the line during the need to period. And as soon as it had its authority to abandon, it didn't, and in fact, sought extensions for several years to seek alternatives to abandon, which it has now done. The railroad maintains its jurisdiction under this board. Can we go back to NHPA? Yes, Judge. You cited the order, A948, that was issued to GWRC saying you can't consummate during the period of review. Fine, that's in the order, but is there some statutory authority to back up that order, that aspect of the order? Well, the NHPA itself requires all agencies to stop and consider the impacts of its actions on historic properties as a matter of the underlying National Historic Preservation Act. And the board itself, it has issued, this is an order it served, it's cited at page 11 of our red brief, and it's an ex parte order that it issued where it says a historic preservation condition is a regulatory barrier to abandonment. Okay, but the Historic Preservation Agency, whatever it is, has no authority to tell people to keep operating a railroad. They can only say don't pull up the track for the talks, right? The STB has... No, yes, no. So I'm not sure which agency you're referring to, Your Honor, but the board has its own independent obligations. No, no, no, but the Historic Preservation Statute, let's say, does not require continued railroad operation. It just says physically, you've got to leave the thing the way it was, right? Not precisely. The NHPA says that you have to account for the impacts of your actions on historic property. This can be done in several ways, including a Section 106 mitigation. You can't tell people, as a matter of historic preservation, you have to keep operating the railroad, right? Well, no, the NHPA doesn't speak about railroad use. Yeah, okay. But the reason it matters is because the STB, in enforcing its obligations and meeting and protecting its obligations under that statute, where the STB has exclusive plenary authority over regulating abandonments, it can tell railroads, you do not have permission to abandon while we are considering our obligations under the NHPA. And that's what the Board did here. Great Western could not have abandoned, no matter what. But does that speak... And correct me if I'm wrong, I got the sense here, and I may be misremembering the record, but I got the sense here, Mr. Herman, that Judge Holt said he had this lengthy discussion of the historic preservation situation. But then he said, this wasn't really a factor. I don't see this as a factor in the railroad's intent. Am I wrong about that? Maybe I... Correct me if I'm... He seemed to say, okay, it was out there, they were constrained, but it wasn't driving their thinking as to what they wanted to do. It limited what they could do, but it wasn't driving their thinking as to what they wanted to do. Am I wrong about that? I don't know that I recall an explicit discussion, but you're right. We certainly never argued below that it was a heavy factor in looking at the facts as a whole. The NHPA, we argued... I thought he said he's not going to reach the issue of the NHPA. Yes, Your Honor, it's a separate legal question as to whether the NHPA alone would have prevented abandonment. He did not reach. He deferred saying, the facts as a whole told me this railroad would not have abandoned, so he didn't reach the NHPA at all. This Court doesn't have to. The fact, the undisputed facts here are enough to support that this railroad would not have abandoned absent the need to use issuance because this railroad continued to use and maintain its railroad before, during, and after the need to. But actually, the NHPA supports the plaintiffs here, doesn't it? Because they didn't pull up the track and the ties, and you say that shows an intent not to abandon, but they're able to say, no, no, the reason we didn't pull up the track and the ties is because of historic preservation. That does not support the plaintiffs here, Your Honor, because the NHPA is not the challenge of government action. The only challenge of government action in this case is the need to, and more than that... No, no, that doesn't address what I'm saying. What I'm saying is the government relies on the fact that the ties and the rails were not pulled up, which shows, which is contrary to the idea that they were abandoning the thing, right? That's their argument. Your Honor, if I might just briefly respond to that point, I see that I'm out of time. Go ahead. It's more than that. The issue is not simply that they left the tracks in place, they spent money repairing the tracks. That's a key distinction here. They didn't organize, like in Memmer, for instance, a company to come along and salvage when they had authority. They paid to repair these tracks and ties. Okay, all right. I think we're out of time. Thank you. Thank you, Your Honor. Mr. Ripley, you've got a couple of minutes there. Thank you. I do want to start with setting aside causation for a second in response. We do still have an alternative path to liability in state law abandonment alone in Prong 3. You should have two minutes. Go ahead. I'm sorry. Prong 3 of Preso 2, going back to Preso 2, says state law abandonment is a specific alternative path to liability. You didn't bring this up in your original argument. This is in response to all the facts being brought up. And I did talk about state law abandonment as context of this whole analysis of causation. I'm looking to state law abandonment in Prong 3. It's an alternative path. It's clearly established here. The CFC agreed as much. We rejected that in Caldwell and Barclays already, right? We said federal law determines what abandonment is. As far as the distinction between state law and federal law? We said federal law governs. Maybe we were wrong, but we've already decided the issue. I believe that contradicts Preso 2, though, their discussion of state law abandonment. I'll just note that that's an alternative path to liability and the Federal Circuit backed that up after that. Going back to Prong 2 analysis on causation, at the end of the day, I think we have to, and going back to the shifting burden analysis, you have to take the railroad's word for it. When they file that notice of exemption for abandonment, they verify before the STB, we intend to abandon this line. There's no freight services. There's no railroad purposes that should be under STB jurisdiction. That's the key point here. Railcar storage falls into that. As I mentioned before, plenty of the cases mentioned railcar storage, and that was not a factor in the railroad's intent. As far as the notice of consummation and that discussion, I'll note that the member court said that that doesn't matter. The actual filing of a consummation abandonment itself is not a prerequisite to finding a temporary taking, because that does not speak, even going back to the railroad's intent, as of the E-2's issuance, that's what establishes causation. And they would have abandoned language. How do we determine that? Looking at the railroad's intent, as stated, in context of 30 years of misuse, as of the E-2's issuance. So I know I'm out of time, but I do just want to wrap up briefly by saying, again, this is a simple question, and all we're asking is to confirm causation was established here based on these facts. This court also has the opportunity to round out the remaining questions presented by Cacklin, where it talked about this burden of production that we've been talking about, where notice of exemption paired with an E-2 establishes affirmative presumption to abandon absent extraordinary circumstances or clear mistake, like in Hardy. Okay, thank you. Thank both counsel. The case is submitted.